# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **DANNY WATKINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:23-cv-00452** |
| | ) | **Judge Aleta A. Trauger** |
| **CITY OF LEBANON, TENNESSEE and** | ) | |
| **CORNELIUS RAY HARRIS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Plaintiff Danny Watkins brings claims under 42 U.S.C. § 1983, asserting that the defendants, the City of Lebanon and Cornelius Ray Harris, an officer with the Lebanon Police Department, violated his rights under the Equal Protection Clause by selectively enforcing municipal codes against him through the issuance of two citations in May 2022. The defendants have jointly moved for summary judgment of all claims against them. (Doc. No. 17.) For the reasons set forth herein, the motion will be granted, and this case will be dismissed in its entirety.

## I.    LEGAL STANDARDS

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant under applicable law is of no value in defeating a motion for summary

judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, inter alia, "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—that it believes demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## II.     FACTS AND PROCEDURAL HISTORY

### A.     The Parties

Watkins is a Black resident of Wilson County, Tennessee.[1] He is a private investor and businessman who owns properties in several states and in Lebanon, Tennessee. He rents out

---

[1] The facts for which no citation is provided are drawn from the plaintiff's Response to the Defendants' Statement of Undisputed Material Facts (Doc. No. 24) or the defendants' Response to Plaintiff's Statement of Additional Material Facts (Doc. No. 28) and are undisputed for purposes of the defendants' Motion for Summary Judgment.

several of the properties in Lebanon, including an apartment complex located at 900 Carthage Highway in Lebanon.

The City of Lebanon is a municipal government organized under the laws of the state of Tennessee and situated within Wilson County.

Defendant Cornelius Ray Harris is a sergeant with the City of Lebanon Police Department ("LPD") in the codes division. He served as a patrol officer for 21 years before becoming the Codes Enforcement Supervisor for the LPD in March 2020. Like the plaintiff, Harris is Black.

### B. The Citations

Among Harris' duties is the enforcement of the Lebanon Municipal Code ("LMC"), including LMC Title 17. Title 17 includes provisions pertaining to refuse and trash disposal. More specifically, LMC § 17-105 identifies the "[h]ours for placement of containers for collection" as follows:

> [Trash] Containers shall be placed for collection no earlier than dusk on the day before collection, and no later than 7:30 A.M. on the scheduled day of collection. Containers must be removed from the curb, street, or alleyway, no later than 7:00 P.M. on the day of collection.

Harris undertakes the following general process when he has identified a violation of Title 17 of the LMC. Upon observation of a violation, Harris typically visits the property and attempts to contact the violator regarding the issue. If immediate contact is made, but compliance cannot be accomplished at that time, a Codes Violation Notice is issued that identifies the violation and what needs to be corrected. If Harris cannot make contact with the violator, he leaves a Codes Violation Notice and attempts to identify the violator and to locate contact information. Harris sends a Codes Violation Notice to whatever contact information he gains through his investigation. The Notice identifies the specific violation, what needs to be corrected, and a date by which the correction needs to be made. If compliance has not been completed at the time of follow up, then a citation

is issued, and a copy is sent to the violator by certified mail. The plaintiff does not dispute that Harris is trained to enforce the laws as written and does not investigate the race of a violator when he is addressing an LMC violation.

Harris pursues enforcement of code violations based on complaints that the LPD receives and on violations the police department has observed numerous times. Not everyone who violates Title 17 regarding the hours of placement for trash containers receives a citation, and officers with the codes department have some discretion as to who receives a citation. (Doc. No. 22-3, Harris Dep. 73–74.)[2] When a codes investigation does not involve closing a business or a court order, Harris does not have to get approval from any superior officer before "taking action to enforce the municipal code." (Doc. No. 22-3, Harris Dep. 18–19.)

Prior to issuing the citations that are the subject of this lawsuit, Harris observed two trash containers at 900 Carthage Highway left by the street past the hours permitted by LMC § 17-105. On a previous occasion, in August 2020 (*see* Doc. No. 17-1, Harris Dep. 26–27), when Harris had attempted to contact Watkins concerning LMC violations at the same address, Harris had contacted attorneys Donnovan Vasek and Kristian Watkins, who advised him to send paperwork regarding codes violations for Watkins' properties to his Post Office Box. Accordingly, upon observing the trash container placement violations at 900 Carthage Highway in the spring of 2022, Harris attempted to notify Watkins of the violations by sending notices to both Watkins' P.O. Box and his home address. All of the notices Harris sent to try to notify Watkins about the trash container placement violations at 900 Carthage Highway were returned. Harris also attempted to contact Watkins by telephone call and text message about the violations, but Watkins did not respond.

---

[2] Neither party filed a complete copy of any of the cited deposition transcripts, which would be the court's preference. The court cites the CM/ECF docket number but uses the original deposition pagination.

Ultimately, Harris issued a citation to Watkins on May 6, 2022 for trash container placement at 900 Carthage Highway in violation of LMC § 17-105. The citation notes: "Numerous warnings given. Containers A & C left out. Trash pick up is Tuesday, today is Friday (5/6/22)." (Doc. No. 17-5, May 6, 2022 Citation.)

Later the same month, Harris again observed trash containers at 900 Carthage Highway left by the street past the hours permitted by the LMC. As before, Harris provided notice to Watkins about the violations and attempted to contact him by phone and text message, without success. He issued Watkins a second citation for violation of LMC § 17-105 on May 28, 2022. The citation notes: "Trash container at the road since Tuesday's disposal 5/24. Numerous warnings given prior. Container(s) continue to be at the roadway." (Doc. No. 17-6, May 28, 2022 Citation.)

Harris knew that Watkins did not live at 900 Carthage Highway. He testified that he did not issue citations to the occupants of units A and C (as marked on the trash containers that had been left by the side of Carthage Highway), because residents of the apartments of 900 Carthage Highway "would very rarely open the door" for Harris as a police officer, and he believed "getting information from [Watkins] was a lot easier." (Doc. No. 17-1, Harris Dep. 28.) He did not recall whether he also attempted to post notice on the apartment doors. (*Id.*) Harris indicated that he would not have issued the citations if Watkins had communicated with him, and he stated that, on both occasions in May 2022 when he issued the citations to Watkins, he checked for trash container violations at other buildings in the area and observed no other trash can placement violations. (*Id.*, Harris Dep. 92, 100.)

The plaintiff takes issue with Harris' testimony. According to Watkins, "[p]eople all over the City of Lebanon leave their trash cans at the curb after trash pickup day. This practice is open, obvious, and widespread. All you have to do is drive down the streets and look." (Doc. No. 22-15,

Pl.'s Answers to Interrogs. No. 3.) Watkins did this: he drove around Lebanon and took pictures of trash containers that had clearly been emptied but were still at the side of the road. (Doc. No. 22-1, Watkins Dep. 99–100; *see also* Doc. No. 22-14, Watkins Dep. Ex. 6, Photographs.) Watkins testified that he personally observed trash containers sitting out on the road that were never pulled in after trash pickup:

> I saw containers at other locations four or five days, week. Never touched. They never pulled them in. If they had gotten a citation from codes, they're going to pull them in. But they just sit there. Sit. For weeks. The pictures will tell you.

(Doc. No. 22-1, Watkins Dep. 44.) Watkins further maintains that, "[a]ssuming that Sgt. Harris drives on the streets of the City of Lebanon and that his vision is good enough to see across the street from [Watkins'] business, he knew and had notice about the other trash containers. The sheer number of open violations of that same ordinance make it obvious to anyone that the law is only being selectively enforced." (Doc. No. 22-15, Pl.'s Answers to Interrogs. No. 8.)

At the court hearing on the citations, City of Lebanon Municipal Court Judge Jim Flood initially seemed inclined to uphold the citations. After hearing argument from Watkins' attorney[3] and considering the wording of LBC § 17-105, Judge Flood noted that the ordinance did not seem to anticipate roll-out trash containers for apartment buildings with multiple units and that these types of commercial properties should instead be equipped with dumpsters.[4] He ultimately dismissed the violations based on the ordinance's placing responsibility for trash containers on "occupants" rather than on owners of housing units, stating, "Just because of the way the ordinance

---

[3] As Watkins' attorney pointed out, many larger apartment buildings are owned by corporate entities that could be based out of state.

[4] Counsel for Watkins stated at the hearing that 900 Carthage Highway is now equipped with a dumpster instead of roll-out trash bins.

is written, I don't feel comfortable proceeding with this." (Doc. No. 17-5, Hr'g Video at timestamp 16:37–41.)

From January 2022 through March 2023, LPD codes enforcement officers issued four citations for violations of LMC § 17-105: two to Watkins, one to Kelly Skeen (on July 19, 2022), a White male, and one to David Foster (on March 15, 2023), a Black male. Harris also issued a notice for a recheck of a violation to a White male for a trash can being at the road past its pickup date in August 2022. In addition, LPD codes enforcement officers have noticed and cited non-Black persons for similar LMC codes violations pertaining to junk, litter, and debris.

### C.     John Hart

A White Lebanon resident named John Hart has been a very close personal friend of Harris' since around 2004. Although they have a long-standing friendship, they have never been engaged in any business or for-profit endeavor together.

Hart did, however, provide management and maintenance services for various properties owned by Watkins in Lebanon from around 1995 until 2022. Watkins terminated Hart's management of one of his properties, the Uptown Motel, around May 2022 because Hart was not maintaining the property and was behind on the fees he owed to Watkins. Also in or around May 2022, Watkins rejected a bid by Hart in favor of another contractor for a remodel on one of his rental properties. According to Watkins, the selective enforcement of the LMC against him began after he terminated Hart's management of the Uptown Motel. According to Watkins, Hart was behind on payments and owed him nearly $100,000 by this time.[5] (Doc. No. 22-1, Watkins Dep. 43.)

---

[5] Watkins explained that Hart ran the motel, made all the decisions, "handled everything, was told it was his," but paid Watkins a monthly fee from the income. (*See* Doc. No. 22-1, Watkins Dep. 27.)

Hart also acted as an agent for Watkins' bail bonding business beginning around 2000 or 2002. In 2009 or 2010, Watkins placed Hart in charge of the day-to-day operations of Watkins Bail Bonding. In 2023, Watkins sold the bail bonding business to Hart. The company closed down later the same year. In May 2023, after Hart stopped making promissory note payments to Watkins in connection with the sale, Watkins sued Hart and his wife.[6]

During his time doing maintenance/repair work for Watkins, Hart appeared in court on behalf of Watkins fifteen times to address LPD-issued code violations against Watkins. On August 18, 2020, while Hart was still doing maintenance/repair work for Watkins, Harris issued a citation to Watkins for violation of LMC § 17-105.

Hart testified that he never made any reports of code violations by Watkins to the LPD Codes Department, to the LPD generally, or to Harris specifically. (Doc. No. 17-13, Hart Dep. 97–98, 101.) The plaintiff acknowledges Hart's testimony but maintains that it is belied by the fact that the last bid Hart put in for work on Watkins' property was around May 19, 2022, for work on property located at 206 Burdock, and Watkins rejected the bid. On May 25, 2022, Harris sent a text message to Watkins, notifying him that "an online Complaint was received this morning for 206 Burdock involving possible infestation and maintenance repair" and "[r]equesting permission to evaluate." (Doc. No. 22-13.) Watkins testified that, around this same time,[7] Hart called him to say, "Code got you" and mentioned that Harris had come by. Hart told him that there was a window

---

[6] Although these facts are undisputed for purposes of the Motion for Summary Judgment, the court notes, based on an exhibit filed by the plaintiff, that the plaintiff filed suit against Hart in 2023 alleging that he had sold the bail bonding business to Hart and his wife in October 2021 and that Hart had immediately fallen behind on payments owed under the associated promissory note. (*See* Doc. No 22-5.)

[7] Watkins testified that he believed these events occurred in 2023, but from context it appears that he meant 2022.

on that property that needed to be replaced. Watkins said "okay" and replaced the window, "[n]o problem." (Doc. No. 22-1, Watkins Dep. 51.)

Watkins also points to a series of text messages (with accompanying photographs) between Hart and Harris, purportedly about codes violations at various properties within Lebanon, including, according to the plaintiff, properties owned by Watkins. Out of almost 100 pages of text messages, the plaintiff points to two exchanges that involved his properties. Regarding the first, Hart was asked about a text message from him to Harris dated August 20, 2022 that says: "Just talked to Skinner he said his attorney told him he don't have to worry about the sprinkle sys because he is non profit and he uses those places for meetings." (Doc. No. 22-8, at 39.) When asked at his deposition who Skinner was, Hart replied that it was Jason Skinner, a "[g]uy that rented from [him]." (Doc. No. 22-2, Hart Dep. 68.) He clarified, when asked, that Skinner actually rented from Watkins through Hart. (*Id.*) Hart explained that Harris (or the codes department) had come to him, because he managed the property, "telling us that they were supposed to have sprinklers in there, in the house, overhead sprinkler system." (Doc. No. 22-2, at 27, Hart Dep. 69.) He sent the text message to Harris to update him on the situation—Skinner's report that he had discussed the matter with his attorney and his attorney's opinion that the property was not required to have sprinklers. (*Id.*) According to Hart, following this exchange, the matter would have been closed. (Doc. No. 22-2, Hart Dep. 70.)[8]

In the second text message, Harris sent Hart a photograph of a shed of some kind, asking: "Is this some of your work from 210 Coles Ferry?? The electrical set up is SO professional and safe. Kids living here . . . nice daycare." (Doc. No. 22-8, at 68.) Hart responded: "That is too nice

---

[8] Jason Skinner is a pastor who operates a ministry that has rented houses from Watkins to use as sober living homes for people recovering from drug and alcohol addiction since 2020. (Doc. No. 22-16, Skinner Decl. ¶ 1.)

for my work 😊 I would of hide it in the walls that is jason skinners work." (*Id.*) Harris testified that 210 Coles Ferry was one of Watkins' properties, but the record does not suggest that a citation was issued in relation to that property.

The plaintiff points to additional facts demonstrating the close relationship between Hart and Harris, including that, while Harris was still a patrol officer, he would visit Hart at the bail bonding company while in his police cruiser; Harris carried bail bonds business cards for Hart in his cruiser; and Hart boasted to Watkins that he "felt like he had a lot of control as an individual with the police department." (Doc. No. 22-1, Watkins Dep. 49.)

He also points to Jason Skinner's testimony that, on some unspecified occasion, the codes department showed up at one of his ministry's houses while Skinner was on-site, and the codes officer told him, "if it was up to me, I would shut down every one of Danny Watkins' properties." (Doc. No. 22-16, Skinner Decl. ¶ 9.)[9] On another occasion (Skinner does not indicate when), the codes department "coordinated codes inspections on all of the [ministry's] houses rented from Mr. Watkins at the same time." (*Id.* ¶ 11.)

**D.  This Lawsuit**

The plaintiff, through counsel, filed this lawsuit in May 2023, naming as defendants both Ray Harris and the City of Lebanon. (Doc. No. 1.) The Complaint contains a single "count" under 42 U.S.C. § 1983 based on the defendants' alleged violation of the plaintiff's right to equal protection, as guaranteed by the Fourteenth Amendment. The court construes the Complaint as asserting four distinct claims, however: (1) a claim against Harris individually for selectively

---

[9] The defendants object to this statement as inadmissible hearsay that cannot be presented in a form that would be admissible in evidence, as required by Rule 56(c)(2) of the Federal Rules of Civil Procedure. (Doc. No. 28 ¶ 41.) The court does not find that this statement is being offered for the truth of the matter asserted. Instead, it is an apparent statement of opinion being offered into evidence simply to show that the statement was made.

enforcing LMC § 17-105 against him based upon his race; (2) a claim against Harris individually for selectively enforcing LMC § 17-105 against Watkins "based on the personal vendetta by Sgt. Harris' close friend, John Hart" (Doc. No. 1 ¶ 57); (3) a claim against the City of Lebanon, premised upon allegations that Harris "acted as a final policymaker with respect to enforcement of Chapter 17 of the [LMC]" (*id.* ¶¶ 59); and (4) a claim against the City of Lebanon based on its "maintain[ing] a widespread custom of enforcing [LMC] § 17-105 disproportionately against Black residents" (*id.* ¶¶ 59, 60).

Discovery having concluded, the defendants filed their Motion for Summary Judgment (Doc. No. 17), arguing that they are entitled to judgment in their favor on all claims against them. The motion is supported by a Memorandum of Law (Doc. No. 18), and, as referenced above, their Statement of Undisputed Material Facts and the evidentiary material supporting their factual statements. (Doc. Nos. 17-1 through 17-15.) The plaintiff opposes the motion (Doc. No. 22) and has filed his Response to the Statement of Undisputed Material Facts (Doc. No. 24), his own Statement of Additional Facts (Doc. No. 23), and additional evidentiary material (Doc. Nos, 22-1 through 22-17). The defendants filed a Reply and a Response to the Statement of Additional Facts. (Doc. Nos. 27, 28.)

## III. DISCUSSION

### A. Selective Enforcement Based on Race

#### 1. *Legal Standards*

"To prevail on a cause of action under § 1983, a plaintiff must prove '(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'" *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting

*Shadrick v. Hopkins Cty.*, 805 F.3d 724, 736 (6th Cir. 2015)). The plaintiff here alleges violations of his right to equal protection under the Fourteenth Amendment by Harris and the City of Lebanon, both state actors for purposes of § 1983.

The Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV; citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). While the government retains broad discretion in deciding whom to arrest and prosecute, *United States v. Armstrong*, 517 U.S. 456, 464 (1996), such discretion is constrained by this command. Because "the enforcement of an otherwise valid law can be a means of violating constitutional rights by invidious discrimination," courts have "developed the doctrine of selective enforcement." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) (quoting *Futernick v. Sumpter Twp.*, 78 F.3d 1051, 1056 (6th Cir. 1996)).

While selective enforcement typically arises as a defense in criminal prosecutions, it "can also lead to § 1983 liability if the plaintiff pleads 'purposeful discrimination.'" *Id.* at 318–19. In the Sixth Circuit, a selective enforcement claim has three elements:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Gardenhire*, 205 F.3d at 319 (quoting *United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991)).[10] "[T]here is a strong presumption that the state actors have properly discharged their

---

[10] In *Straser v. City of Athens*, 951 F.3d 424 (6th Cir. 2020), the court articulated a four-element standard, holding that a plaintiff seeking to prove selective enforcement must show that:

official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary; 'the standard is a demanding one.'" *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997) (quoting *United States v. Armstrong*, 517 U.S. 456, 463 (1996)).

To establish discriminatory intent (or purpose), the plaintiff must "put forward more than speculations or intuitions." *Bowman v. City of Olmsted Falls*, 756 F. App'x 526, 530–31 (6th Cir. 2018) (citing *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007)). In *Gardenhire*, for example, the plaintiffs argued that the police had no logical reason to prosecute them rather than a third person, so the arrest must have been motivated by their interracial marriage. 205 F.3d at 320. The Sixth Circuit opined that, "[w]hile such reasoning would be sufficient in establishing a *prima facie* Title VII case, the standard for selective enforcement is much more demanding." *Id.*

To establish discriminatory effect, the plaintiff must show that the prosecution had a discriminatory effect on the *group* to which he belongs. *Gardenhire*, 205 F.3d at 319. To do so, "it is an absolute requirement that the plaintiff make at least a *prima facie* showing that similarly situated persons outside her category were not prosecuted." *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997) (citing *United States v. Armstrong*, 517 U.S. 456, 467 (1996)). "To be 'similarly situated' for purposes of an equal-protection claim, the plaintiff and the comparator must be alike 'in all relevant respects.'" *Reform Am. v. City of Detroit*, 37 F.4th 1138, 1152 (6th Cir. 2022) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

In this case, while it is undisputed that the plaintiff, being Black, belongs to an identifiable group, the defendants argue that he cannot establish the other elements of a selective enforcement

---

(1) he belonged to a particular race, religion, or other identifiable group; (2) the official did not enforce the rule against similarly situated people outside the group; (3) the prosecution stemmed from a discriminatory purpose; and (4) the prosecution had a disparate effect.

*Id.* at 426 (citing *Gardenhire*, 205 F.3d at 319).

claim. More specifically, they argue that, to prove discriminatory intent, Watkins cannot rely on statistics but must show that Harris had some "bad reason for enforcing the law against [him]" or that he had no rational basis for enforcing LMB § 17-105 against him, which he cannot do. (Doc. No. 18, at 13 (citing *Boone v. Spurgess*, 385 F.3d 923, 932 (6th Cir. 2004)).) They also argue that Watkins cannot meet his evidentiary burden of identifying similarly situated non-Black individuals who were *not* prosecuted or that enforcement has had a discriminatory effect on the plaintiff's group, since he cannot show an appreciably greater enforcement against Black individuals as opposed to White individuals. (*See id.* at 14 (citing *Straser v. City of Athens*, No. 3:18-cv-187, 2019 WL 2505036 (E.D. Tenn. June 17, 2019), *aff'd*, *Straser v. City of Athens*, 951 F.3d 424 (6th Cir. 2020)).)

### 2.    *Discriminatory Effect*

Watkins argues that he has sufficient evidence to establish selective enforcement based on race, given that three of the four citations issued between January 2022 and March 2023 for violations of § 17-105 were issued to Black individuals (two of them to Watkins) and only one to a White individual, meaning that 75% of the citations were issued to Black individuals. The court finds that statistics made up of a sample size of four are too unreliable to constitute evidence that the defendants disproportionately targeted Black individuals. Notably, in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), a Title VII employment discrimination case, the Supreme Court rejected the defendants' arguments that statistics *never* can establish a *prima facie* case of discrimination, but it held that statistics, *when bolstered by other evidence*, may, depending on the circumstances, establish a *prima facie* case of racial discrimination. *Id.* at 338–40. The Court also cautioned that the "usefulness [of statistics] depends on all of the surrounding facts and circumstances." *Id.* at 340; *see also id.* at 339 n.20 ("Considerations such as small sample size may, of course, detract from the value of such

evidence."). In *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 (1988), the Court further observed that its "formulations, which have never been framed in terms of any rigid mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation."

Here, the plaintiff must present clear evidence, not merely a *prima facie* case. *See Gardenhire*, 205 F.3d at 320 (6th Cir. 2000) (emphasizing that "the standard for a selective enforcement claim is much more demanding" than that required for a *prima facie* case under Title VII); *Stemler*, 126 F.3d at 873 (requiring "clear evidence" of discrimination to overcome the "strong presumption that the state actors have properly discharged their official duties"). Irrespective of what percentage of the population of the City of Lebanon consists of Black individuals, the plaintiff's proposed sample of three people and four citations simply is not large enough to establish that the defendants "disproportionately prosecuted Black people for the specific code violations at issue in this case" (Doc. No. 22, at 9) or that the alleged selective enforcement had a discriminatory effect on Black citizens of Lebanon, as a group.[11] *Accord Thompson v. Badgujar*, No. CV DLB-20-1272, 2023 WL 6381509, at *6 (D. Md. Sept. 29, 2023) (finding data on eighty arrests to be too small a sample size to support an inference of discriminatory intent or discriminatory effect). The fact that only one other Black person was cited for violation of the same ordinance during the relevant timeframe is insufficient to establish that Harris' enforcement of § 17-105 had a discriminatory effect on the Black citizens of Lebanon as a *group*. For this reason alone, the plaintiff's selective enforcement claim fails.

---

[11] Moreover, as the defendants point out, Harris testified that his practice is to issue notices of violations and to attempt to get property owners to cure violations before he issues citations. The plaintiff has presented no evidence of the number of warnings issued or the racial make-up of the recipients of such notices.

But it fails on other fronts as well. The plaintiff also argues that a drive around the City of Lebanon reveals numerous violations of the trash container ordinance and that he personally witnessed violations by White business owners, including John Hart, Greg Dugdale, Jay White, and "Mr. Stone," but that these White business owners did not receive citations. In support of this contention, the plaintiff relies on his own observations and his own photographs of trash containers in front of other businesses. As the defendants point out, however, aside from John Hart, the plaintiff has not identified who owns the properties in the photographs he has introduced and cannot say when the trash containers were placed on the curb, when they were removed, or whether the owner/occupants of the properties received communications from the LPD, ignored such communications, or complied after receiving Codes Violation Notice. And, while he identified Greg Dugdale and Jay White as White business owners who are similarly situated to him, Watkins conceded that he did not know if Dugdale or White had ever received citations from a codes enforcement officer with the LPD, and it was only his "personal opinion" that they were being treated differently from him. (*See* Doc. No. 22-1, Watkins Dep. 40–41.) He also has not pointed to evidence of complaints being called in about these purported violations or evidence that the LPD or the codes division specifically was aware of the violations the plaintiff himself claims to have witnessed.

Regarding John Hart specifically, the plaintiff testified that Harris "personally knows" Hart, as he has described, and "used to visit him all the time at the bonding company, so it stands to reason that he can see those trash cans at his current business out past pick-up day." (Doc. No. 22-2, Watkins Dep. 44–45.) Again, however, Watkins testified that he does not, in fact, have any knowledge that any particular LPD codes enforcement officer, including Harris, was aware of the violations Watkins believes his photographs depict, including the violations by Hart. (*See id.*,

Watkins Dep. 75–76.) Harris testified affirmatively that he had never seen trash containers outside Hart's business in violation of LMC 17-105. (Doc. No. 17-1, Harris Dep. 46–47.) The plaintiff's speculation is not sufficient to establish that these individuals were sufficiently similarly situated to Watkins to satisfy his burden of proof.

Finally, the fact remains that at least one White person (along with two Black people) was cited for violating § 17-105 during the time frame the parties reference (January 2022 through March 2023). Under *Stemler*, "it is an absolute requirement that the plaintiff make at least a *prima facie* showing that similarly situated persons outside her category were not prosecuted." 126 F.3d at 873. The plaintiff has not actually established that any similarly situated White people were *not* cited, and at least one White person did receive a citation during the time period for which records have been produced.

The court finds, in short, that the plaintiff does not have sufficient evidence of discriminatory effect to establish a claim of selective enforcement based on race.

### 3. *Discriminatory Intent*

Even if he had evidence of discriminatory effect, the plaintiff also lacks evidence of discriminatory intent. Determining whether official action was motivated by intentional discrimination "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

The plaintiff asserts, in a very cursory fashion, that the fact that he was targeted for codes enforcement while similarly situated White property owners were not constitutes evidence of discriminatory intent. As set forth above, however, the court finds the same evidence insufficient

to establish discriminatory *effect*, and it fares no better as evidence of discriminatory *intent*.[12] The plaintiff also asserts that the "close relationship between Harris and John Hart, combined with their exchanges concerning code violations on Mr. Watkins' properties," further demonstrates that the citations . . . were driven by a discriminatory motive against Mr. Watkins." (Doc. No. 22, at 12.)

In support of this assertion, he cites broadly to Hart's deposition testimony about the string of text messages between him and Harris, but the plaintiff does not explain how that testimony establishes a discriminatory motive on the part of Harris. It seems clear that Hart sent Harris text messages about several different properties he believed to be in violation of codes, but the race of the property owners is not identified—nor is it clear that any of those references resulted in warnings or citations by the code department. In any event, the plaintiff provides no explanation

---

[12] The evidentiary support offered for this assertion is Harris' deposition transcript. In one excerpt of the transcript, Harris is shown a copy of a February 22, 2023 letter written by one of the plaintiff's attorneys to Mr. Stephen Chambers, who is not identified except that he appears to be a city official, as his email address ends in "lebanontn.org." (*See* Doc. No. 22-12.) In this letter, the plaintiff's attorney asserts that it had come to his attention that day that "the Codes Department for the City of Lebanon has been to most, if not all of the various properties in Wilson County owned by Mr. Watkins and/or in the Danny Watkins trust." (*Id.*) These allegations do not form part of the basis for Watkins' Complaint, filed herein in May 2023, and this letter constitutes double or triple hearsay, insofar as it is a statement by a third party in a letter introduced as an exhibit during Harris' deposition. (*See* Doc. No. 22-3, at 21, Harris Dep. 71 (professing "shock" at allegations that the codes department had been targeting Watkins). The court attaches no evidentiary value to this letter. Even if it could be considered for the truth of the matter asserted, it sheds no light on the actions that took place in May 2022.

In a second excerpt, Harris is asked to identify some of the people who have received citations for various trash-related code violations, and the three people he happens to remember as receiving citations were Black. This testimony in no way tends to establish that Harris himself enforced code violations against Black individuals with discriminatory intent, particularly in light of the spreadsheet introduced by the plaintiff, but created by the City of Lebanon, showing all citations issued by the LPD property codes division, from January 2022 through March 2023, which appears to include more than 300 entries. The plaintiff does not identify the race of any of the property owners associated with these citations; nor does he contend that they are all, or even disproportionately, Black.

for why he believes that the close friendship between Harris, who is Black, and Hart, who is White, is evidence of Harris' intent to discriminate against Watkins on the basis of race.

While the fact that Harris himself is also Black is not dispositive on its own, it "may weaken an inference of discrimination." *B&S Transp., Inc. v. Bridgestone Ams. Tire Operations, LLC*, 171 F. Supp. 3d 669, 678 (N.D. Ohio 2016), *adhered to on reconsideration*, No. 5:13-CV-2793, 2017 WL 5554769 (N.D. Ohio Nov. 17, 2017), *aff'd*, 758 F. App'x 503 (6th Cir. 2019); *Turner v. City of Akron*, No. 5:06CV3023, 2008 WL 45376, at *14 n.22 (N.D. Ohio Jan. 2, 2008) ("Though not dispositive, the fact that Chief Gladman, the decision-maker, shares the same race as Plaintiff further undermines Plaintiff's already weak showing of discrimination."), *aff'd*, 324 F. App'x 453 (6th Cir. 2009). Here, given the plaintiff's weak showing, the fact that Harris is also Black further cuts against his claim of discriminatory intent.

The plaintiff, in short, provides little but his own speculation in support of his allegations of discriminatory intent. "To survive a summary judgment motion, a plaintiff must put forward more than speculations or intuitions." *Bowman v. City of Olmsted Falls*, 756 F. App'x 526, 530 (6th Cir. 2018) (quoting *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007)). The plaintiff's failure to present adequate proof of discriminatory intent provides an independent basis for granting summary judgment on this claim.

Because the plaintiff cannot establish the necessary elements, Harris is entitled to summary judgment on the claim against him for selective enforcement based on race.

### B.  Class-of-One Claim

The Complaint also asserts, in the alternative, that Watkins was targeted for selective enforcement "based on the personal vendetta by Sgt. Harris' close friend, John Hart." (Doc. No. 1

¶ 57.) The parties identify this as a "class of one" claim.[13]

"The Supreme Court has recognized 'successful equal protection claims brought by a "class of one," where the plaintiff alleges that [1] she has been intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment.'" *Johnson v. Morales*, 946 F.3d 911, 939 (6th Cir. 2020) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). To establish the first element, the plaintiff must show that "the plaintiff and the others who were treated differently were "similarly situated in all relevant respects." *Id.* (quoting *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 865 (6th Cir. 2012)). For the second element, the plaintiff may establish the absence of a rational basis "either by negativ[ing] every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* (quoting *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005)).

The defendants argue that the plaintiff has not identified any similarly situated individuals who were treated differently from him and has no evidence of discriminatory intent. (*See* Doc. No. 18, at 16.) They also point out that, while the plaintiff believes that Hart was "upset" about the plaintiff's termination of the business relationship between him and Hart, the evidence shows that Hart continued to operate the plaintiff's bail bond business for Watkins until sometime in 2023. Moreover, while managing the plaintiff's properties, Hart appeared in court on behalf of Watkins fifteen times over the years to address code violations, including a court appearance in 2020 specifically on a citation for improper trash can placement at 900 Carthage. (Doc. No. 17-13, Hart

---

[13] The plaintiff, confusingly, argues in response to the Motion for Summary Judgment that the Complaint adequately states a class-of-one claim under Rule 12(b)(6). (*See* Doc. No. 22, at 14.) The defendants do not argue that the Complaint fails to state a class-of-one claim; they argue that the plaintiff fails to identify his "personal vendetta" claim as a class-of-one claim. (Doc. No. 18, at 16 n.3.) They do not seek dismissal of the claim on this basis.

Dep. 27–28, 106, 112–13.) The defendants also point to Hart's and Harris' testimony denying that Hart ever reported code violations by Watkins to Harris. (*Id.*, Hart Dep. 97–98, 101, 112; Doc. No. 17-1, Harris Dep. 68–69.)

Regarding the rational basis for his actions, Harris testified that he initially attempted to issue warnings regarding the trash container placement and only issued citations after Watkins failed to respond to any of his repeated efforts to contact him about the violations. He also testified that he attempted to contact Watkins, as the property owner, rather than the occupants of the apartments who had left out their trash containers, because, in his experience, the occupants were relatively transient, difficult to contact, and unlikely to open the door for a police officer. The defendants point out that Municipal Court Judge Flood initially was inclined to enforce the citations against Watkins. Even though Judge Flood eventually changed his mind, the defendants argue that his consideration of the issue establishes that it was a difficult one and that Harris was rational in issuing the citations to Watkins as the property owner rather than to the occupants of the property.

In response, the plaintiff argues that he has identified individuals similarly situated to him in all relevant ways who were not cited, despite engaging in the same behavior. He argues that the relevant characteristics required for a comparator to be similarly situated are "simply (a) other property owners in the City of Lebanon, who (b) left their trash containers out past 7:00 p.m. on the day trash was collected." (Doc. No. 22, at 15.) The court rejects this characterization. The relevant facts concerning the plaintiff's citations are that (1) the trash containers were left out for several days past the pick-up date, not just past 7:00 p.m. on the day of pick-up (*see* Doc. Nos. 17-5, 17-6, Citations); (2) Harris was made aware of the violations; (3) Harris attempted to contact the plaintiff through email, telephone, text message, and mail to ask him to correct the violations;

and (4) Harris issued the citations after the plaintiff failed to remedy the violations after being notified of them. The plaintiff has not pointed to any other property owners who are similarly situated to him in these respects.

The plaintiff posits that John Hart is a White business owner and property manager who routinely left out his trash containers for "weeks at a time" but did not receive citations. He also alleges that "Mr. Stone" owned an apartment complex near 900 Carthage Highway and did not receive citations, despite Watkins' observation of trash container violations at Stone's property. (Watkins Dep. 96–98.) Watkins also points to his own observations of "open and obvious" violations of the trash container placement ordinance and the fact that, despite the numerous violations he himself allegedly observed, only four citations were issued for violations of § 17-105 from January 2022 through May 2023, two of which were issued to him. Again, however, Watkins has not established that Harris was aware of these violations or that Harris attempted to contact the property owners without success in order to obtain compliance with the ordinance before issuing a citation.

Finally, Watkins points to the close relationship between Hart and Harris and the timing of the citations as evidence of personal animus. Specifically, at some point, Watkins asked Hart to "step down" from managing the Uptown Motel. He does know when exactly this occurred, but he believes it happened "right in the area" or within a few months prior to May 2022. (Doc. No. 22-1, at 7, 13, Watkins Dep. 27, 43; Doc. No. 17-2, at 7, 9, 13. Watkins Dep. 19, 21, 30.)[14] In addition, Watkins points to the timing of Hart's last bid for work on Watkins' property. According to Watkins, this occurred on May 19, 2022, for work on property located at 206 Burdock, and

---

[14] Although Watkins' testimony about the date is equivocal, for purposes of their Motion for Summary Judgment, the defendants apparently accept that this occurred around May 2022. (Doc. No. 19, Def's Statement of Undisp. Mat'l Fact ¶ 41.)

Watkins rejected the bid. Shortly after that, on May 25, 2022, Harris sent a text message to Watkins, notifying him that "an online Complaint was received this morning for 206 Burdock involving possible infestation and maintenance repair" and "[r]equesting permission to evaluate." (Doc. No. 22-13.) That complaint did not result in a citation, but Harris issued the second trash container citation for 900 Carthage Highway shortly after that. Watkins explained:

> I just felt that Mr. Hart had became bitter because I took the complex [sic] away. And he kind of lashed out as to retaliate. He felt that he had a lot of control as a[n] individual with the police department. He always kind of boasted that. And I think that you can see the timing, the timing shifted to that direction, and that's when it, in my personal opinion, is when it started. . . . I don't have the actual facts. The timing was interesting.

(Doc. No. 22-1, at 17, Watkins Dep. 49.)

The plaintiff points to additional evidence he characterizes as circumstantial evidence that the citations against him were based on personal animus, including that citations should never have been issued to him as the property owner instead of to the individual occupants; that the two citations issued to him represent 50% of the citations for violations of § 17-105 issued between January 2022 and March 2023; that Hart sent Watkins a text stating "codes got you," regarding the 206 Burdock complaint; that an unidentified LPD code department officer allegedly told Jason Skinner, "If it was up to me, I would shut down every one of Danny Watkins' properties (Doc. No. 22-16, Skinner Decl. ¶ 9); that, on another occasion, a codes officer showed up at one of Skinner's ministry's properties and asked to do an inspection and, when Skinner denied permission for the codes officer to enter, the officer informed him that "Sgt. Harris put a forced entry call on the property and they had to go in" (*id.* ¶ 10). These allegations, however, are of limited evidentiary value, given that (1) Watkins does not allege that he received a citation in association with the 206 Burdock complaint or even that the complaint was unjustified; and (2) Skinner does not allege

when these investigations of his ministry's premises occurred, that they were in any way unjustified or unsubstantiated, or that they resulted in ordinance citations.

Coincidental timing aside, the court finds that the evidence, viewed in the light most favorable to the plaintiff, is insufficient to establish a class-of-one violation. The plaintiff's testimony about driving around town and purportedly observing other violations of the trash container placement ordinance is not sufficient, standing alone, to establish that there were any other similarly situated property owners who were not cited for the same conduct. Again, as set forth above, the plaintiff would need to show that the trash containers were left out for several days after the trash pick-up date, that Harris was aware of the violations, that Harris attempted to notify the property owners about the violations, and that the property owners failed to remedy the violations after notice. Watkins presents no evidence to establish any of these facts as to any other property owner. Simply asserting that numerous individuals in Lebanon leave their trash containers past the pick-up date is not sufficient. Moreover, given Harris' testimony regarding his attempts to contact Watkins to remedy the violations before he issued a citation and the somewhat ambiguous wording of the ordinance, the court cannot find that Harris lacked a rational basis to enforce the ordinance against Watkins as the property owner.

Harris is entitled to summary judgment on the class-of-one claim as well. And because the court finds that the plaintiff lacks sufficient proof of a violation of his equal protection rights to defeat summary judgment, the court has no need to consider the issue of qualified immunity.

### C. *Monell* Claims Against the City

The fact that an individual government actor is not liable for a constitutional violation does not automatically mean that the *Monell* claim against the municipality fails as a matter of law. *See, e.g.*, *Grote v. Kenton Cty.*, 85 F.4th 397, 414–15 (6th Cir. 2023) (recognizing that there are "scenarios when no officer may have acted unconstitutionally, but the municipality has nonetheless

inflicted constitutional harm on a victim," such as failure-to-train or systemic problems demonstrating deliberate indifference). Here, however, the plaintiff's claims against the City of Lebanon are premised entirely upon allegations that Harris violated his constitutional rights and that Harris acted as a final policymaker for the City, such that Harris' actions can be attributed to the municipality itself. Because the plaintiff cannot establish that a violation of his constitutional rights occurred at all, his claims against the City of Lebanon also fail, and the City is entitled to summary judgment as well. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Epps v. Lauderdale Cty.*, 45 F. App'x 332, 334 (6th Cir. 2002) (construing *Heller* to mean that, "[w]hen no constitutional harm has been inflicted upon a victim, damages may not be awarded against a municipality").

## IV. CONCLUSION

For the reasons set forth herein, the defendants' Motion for Summary Judgment will be granted and this case dismissed. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge